524 S.E.2d 447

**STATE of West Virginia, Plaintiff below, Appellee,**

v.

**Casey RYGH, Defendant below, Appellant.**

**No. 26195.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 1999.

Decided Dec. 3, 1999.

Darrell V. McGraw, Jr., Esq., Attorney General, David P. Cleek, Esq., Senior Deputy Attorney General, Charleston, West Virginia, Attorneys for Appellee.

Todd A. Mount, Esq., L. Scott Briscoe, Esq., Shaffer & Shaffer, Madison, West Virginia, Attorney for Appellant.

STARCHER, Chief Justice:

This is a murder case where the circuit court allowed the appellant's juvenile justice records to be obtained and used by the prosecution against the appellant. We conclude that because the records were used for purpose of impeachment during the cross-examination of a witness for the appellant, the circuit court did not err. We affirm the appellant's conviction.

I.

*Facts & Background*

The appellant, Casey Rygh, was convicted in the Circuit Court of Logan County of two felony murder counts and of conspiracy to commit aggravated robbery.

■ Prior to trial, the court granted, over the appellant's objection, the prosecution's motion to bifurcate the trial, and to conduct a separate proceeding on the mercy issue, if the appellant were convicted on a charge where the jury could consider the issue of mercy.[1] Additionally, the court granted over

---

1. If the jury renders a verdict convicting a defendant of first degree murder, and recommends mercy, the defendant is sentenced to life imprisonment, but is eligible for parole consideration in 15 years. If mercy is not recommended, the defendant is not eligible for parole. *W.Va.Code,*

the appellant's objection the prosecution's motion to unseal and furnish to the prosecution the appellant's juvenile law enforcement records, so that the records and evidence derived from them might be available for possible use against the appellant during a possible bifurcated "mercy phase" of the trial.

Following the jury's verdict convicting the appellant, a "mercy phase" proceeding was conducted before the same jury. The jury returned a recommendation of "mercy" on one felony murder count, and "no mercy" on the other felony murder count. The judge sentenced the appellant in accordance therewith.

62-3-15 [1965]. In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court authorized the discretionary bifurcation of a murder trial into a "guilt phase" and a "mercy phase," as a matter of trial management procedure. We also recognized that "[i]t may well be true that unitary trials are adequate and appropriate in most cases."

We observe that there is nothing in *LaRock* that creates, merely by bifurcating a murder trial, a qualitative change in or a substantive expansion of the scope or type of evidence that the prosecution may put on against a defendant—as compared to that evidence that would be admissible in a unitary trial. Stated another way, discretionary trial-management bifurcation does not itself alter or expand the scope of admissible prosecutorial evidence to include evidence that has been historically inadmissible in murder cases in this State. (Because bifurcation is a matter of trial court discretion, such an expansion could raise, *inter alia*, equal protection and due process issues, if one defendant were tried in a bifurcated proceeding with relaxed evidentiary limitations—as opposed to another defendant, who is tried in a unitary proceeding.)

We recognize, of course, that the evidentiary opportunities that a defendant may have in a mercy phase, as a result of bifurcation, may in turn affect the evidentiary limitations of the prosecution in rebuttal or impeachment. However, the opportunity for prosecution rebuttal or impeachment in a bifurcated mercy phase is not authorization for the prosecution to use unfairly prejudicial, extraneous, remote, or inflammatory evidence—even in rebuttal or impeachment. *See* note 2 *infra*. We also observe that the availability of discretionary trial-management bifurcation in a West Virginia murder case does not mean that the body of case law that has developed in capital punishment jurisdictions around death-penalty/sentencing-phase proceedings is now applicable to the trial of West Virginia murder cases.

In his petition for appeal, the appellant raised a number of issues, and *inter alia* assigned as error (1) the bifurcation of his trial; and (2) the court's permitting the unsealing and use of the appellant's juvenile records by the prosecution in connection with the mercy phase of the bifurcated trial.

We accepted the appeal on one issue only—the issue of the court's ruling with respect to the appellant's juvenile records. We therefore proceed on the premise that bifurcation itself was proper, and we address only the issue of whether the court erred with respect to its ruling regarding the use of the appellant's juvenile records in connection with the bifurcated mercy phase.[2]

We do not believe that conceptually there is any separate or distinctive "burden of proof" or "burden of production" associated with the jury's mercy/no-mercy determination in a bifurcated mercy phase of a murder trial, if the court in its discretion decides to bifurcate the proceeding. In making its overall verdict, in a unitary trial or a bifurcated trial, the jury looks at all of the evidence that the defendant and the prosecution have put on—and if the jury concludes that an offense punishable by life imprisonment was committed, then the jury determines the mercy/no-mercy portion of its verdict, again based on all of the evidence presented to them at the time of their determination. We would anticipate that a defendant would ordinarily proceed first in any bifurcated mercy phase. We emphasize that the possibility of bifurcation of a mercy phase is not an open door to the expansion of the ambit of evidence that the prosecution may put on against a defendant, in the absence of the defendant opening that door to permit narrowly focused impeachment or rebuttal evidence from the prosecution.

2. In the trial transcript of the "mercy phase" proceedings furnished to this Court, there was little objection made by the appellant's trial counsel to the evidence presented by the prosecution during the mercy phase. The appellant's appellate counsel has filed a pleading with this Court indicating that there "may have been" a hearing (for which the court reporter has neither recalled nor located a transcript) in which the appellant raised admissibility objections to some or all of the evidence that was presented against the appellant in the mercy phase. We proceed upon the record before us, and will not presume the existence of objections that are not documented.

Specifically, during the mercy phase the prosecution presented (apparently unobjected-to) testimonial evidence regarding prior assaults and drug use by the appellant. This evidence may have been developed as a result of the prosecu-

The specifics of the direct use of the appellant's juvenile records at trial are as follows. The thrust of the appellant's evidence in the penalty phase was that he had a dysfunctional home life. The appellant testified and described how he had grown up in a broken home and was poorly educated. The appellant admitted in response to a question from his own lawyer that he had gotten into fights as a juvenile. His mother testified that he was nevertheless a "good kid."

The prosecution used a copy of a juvenile petition from the appellant's juvenile justice records in cross-examination of the appellant's mother—to demonstrate that despite her assertions that he was a "good kid," she had filed a petition for delinquency against him. The petition itself was apparently not introduced into evidence.

## II.

### Standard of Review

We are reviewing the circuit court's legal determination that the protection that West Virginia law gives to juvenile records did not bar the court from allowing the prosecution to obtain and use the appellant's juvenile records. This determination is one of law, and we review the court's ruling *de novo*.

## III.

### Discussion

 The principal statutory provision regarding the confidentiality of juvenile law enforcement records is found at *W.Va.Code,*

tion's access to the appellant's juvenile records— or it may have had an independent source. We do not address the issue of whether this evidence was erroneously admitted.

During the mercy phase of the appellant's trial, the prosecution also introduced gruesome photos of the victims—also apparently without a substantive objection by appellant's counsel. *State v. Derr*, 192 W.Va. 165, 178–79, 451 S.E.2d 731, 744–45 (1994) reiterated this Court's awareness of the potential for "hideous, ghastly, horrible, or dreadful" photographs to "arouse passion and cause the jury to [act] on improper grounds," a concern that is applicable to both phases of a bifurcated murder trial. *See* note 1 *infra*. However, in the instant case we do not address the issue of the admissibility of the victims' photographs, as it is not before us.

49–5–17 [1997].[3] We stated in *State v. Van Isler*, 168 W.Va. 185, 283 S.E.2d 836 (1981):

W.Va.Code, 49–5–17 [1978], is part of a comprehensive legislative scheme relating to the handling, disposition and rehabilitation of juvenile offenders. Part of the purpose and intent behind that scheme is to protect the anonymity of juvenile offenders and to assure that they are accorded a fresh start, unhaunted by past trouble, when they reach their majority. This purpose runs throughout Chapter 49 of the Code. The Legislature has used direct forceful language to effectuate this purpose. *W.Va.Code,* 49–7–1 [1978], for example, provides in part: "All records of the state department, the court and its officials, law-enforcement agencies and other agencies or facilities concerning a child as defined in this chapter shall be kept confidential and shall not be released[.]"

168 W.Va. at 186, 283 S.E.2d at 837 (citations omitted).[4]

In Syllabus Point 1 of *Van Isler*, this Court stated (with emphasis added):

*W.Va.Code,* 49–5–17(d) [1978], does' not authorize a court to permit juvenile law enforcement records to be used in a criminal case as *evidence in chief* in the State's case.

Thus, *Van Isler* (a salutary case that is strongly protective of the confidentiality of juvenile records) recognizes the rule that prohibits the wielding of juvenile records as a "sword" in the prosecution's case-in-chief.

**3.** We omit quotation and detailed exegis of this lengthy statute, which was most recently amended in 1997, but not in ways that affect our analysis in the instant case.

**4.** In *State v. Roy,* 194 W.Va. 276, 460 S.E.2d 277 (1995), this Court examined a discovery request for confidential counseling records of a juvenile victim. We held that if an accused can show the relevance of such statutorily protected records, they may be discovered and used to impeach a prosecuting witness' credibility. The rationale of the *Roy* case is that statutory protections restricting the disclosure of confidential records information may not operate to unconstitutionally impede an accused's constitutional right to a criminal defense, including the right to fairly cross-examine witnesses.

But *Van Isler* also, by clearly limiting its articulation of this rule to the prosecution's case-in-chief, recognizes that the rule does not prohibit the use of juvenile records as a "shield"—to rebut or impeach evidence that is presented by a criminal defendant.

 Thus, the logical corollary of Syllabus Point 1 from *Van Isler* is, and we today hold that, *W.Va.Code*, 49–5–17 [1997] does not prohibit the use of juvenile law enforcement records against a defendant in a criminal case as rebuttal or impeachment evidence.[5]

 The narrow issue then presented in the instant case is whether the prosecution's use of the appellant's juvenile records was a part of the prosecution's case-in-chief, or as rebuttal evidence.

"Case-in-chief" is that part of a trial in which the party with the initial burden of proof presents his evidence before he rests. *Black's Law Dictionary*, 1990. "Rebuttal evidence" is "evidence given to explain, repel, counteract or disprove facts given in evidence by the opposing party.... [e]vidence which is offered by a party after he has rested his case and after the opponent has rested in order to contradict the opponent's evidence." *Id.* "Impeach" means to "dispute or contradict a witness' testimony." *Id.*

In the instant case, the use of the appellant's juvenile records at trial was to cross-examine and impeach the appellant's mother's assertions about the appellant. This was rebuttal or impeachment that was specifically directed to contradicting the mother's assertions about the appellant. As such, the use of the juvenile records was not prohibited.[6]

### IV.

#### *Conclusion*

The trial court did not err in its rulings with respect to the appellant's juvenile records. Consequently, we affirm the appellant's conviction.

Affirmed.

Judge ROBERT B. STONE, sitting by special assignment.

Justice SCOTT did not participate in the decision of the Court.

5. This is not to say that the lack of a statutory prohibition automatically makes such records admissible. They are, of course, subject to all other rules of admissibility.

6. The circuit court properly issued a limiting instruction requiring that the appellant's records not be disclosed or used except in connection with the appellant's criminal trial, when it permitted the prosecution to unseal the records before trial.